MATTHEW KUMIN, State Bar No. 177561
KUMIN SOMMERS LLP
870 Market Street, Suite 428
San Francisco, CA 94102
Telephone:      (415) 434-4500
Facsimile:      (415) 434-8453
e-mail:          matt@kuminsommers.com

DAVID M. MICHAEL, State Bar No. 74031
LAW OFFICE OF DAVID M. MICHAEL
101 California Street, Suite 2450
San Francisco, CA 94111
Telephone:      (415) 946-8996
Facsimile:      (877) 538-6220
e-mail:          dmmp5@aol.com

ALAN SILBER, State Bar No. 52973
WALDER, HAYDEN, & BROGAN, P.A.
5 Becker Farm Road
Roseland, NJ 07068
Telephone:      (973) 436-4122
Facsimile:      (973) 436-4232
e-mail:          ASilber@whbesqs.com

Additional Counsel Listed On Signature Page

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CONEJO WELLNESS CENTER COOPERATIVE, INC. a mutual benefit non-profit cooperative; EXECUTIVE CENTER OF SIMI VALLEY, LLC, a limited liability company; and BILLIE JO MAISONET, an individual,<br><br>                                    Plaintiffs<br><br>              vs.<br><br>ERIC HOLDER, Attorney General of the United States; MICHELLE LEONHART, Administrator of the Drug Enforcement Administration; ANDRÉ BIROTTE JR., U.S. Attorney for the Central District of California,<br><br>                                    Defendants. | Case No. CV11- 9200 DMG (PJWx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ...................................................................................................... i

**TABLE OF AUTHORITIES** ................................................................................................... iii

**STATEMENT OF FACTS** ...................................................................................................... 1

   **A. RIPENESS** ................................................................................................................... 1

   **B. JUDICIAL ESTOPPEL** ............................................................................................ 2

   **C. EQUAL PROTECTION** ............................................................................................ 4

**ARGUMENT** ........................................................................................................................... 5

  **I.**   **PLAINTIFFS' CLAIMS ARE RIPE** ........................................................................ 5

     **A. PLAINTIFFS SATISIFY THE CONSITITUTIONAL COMPONENT OF THE RIPENESS ANALYSIS** ......................................................................................... 6

       **1. OVERVIEW OF RIPENESS STANDARD** ................................................... 6

       **2. PLAINTIFFS SATISFY ALL 3 PRONGS OF THE RIPENESS TEST PARTICULARLY SINCE PLAINTIFFS ARE UNDER  IMMINENT THREAT OF ARREST, PROSECUTION AND FORFEITURE** ..................................... 6

     **B. PLAINTIFFS SATISIFY THE PRUDENTIAL COMPONENT OF THE RIPENESS ANALYSIS** ..................................................................................... 8

  **II.**  **PLAINTIFFS HAVE PLED FACTS SUFFICIENT TO STATE A CAUSE OF ACTION** .......................................................................................................... 8

  **III.** **THE GOVERNMENT IS JUDICIALLY ESTOPPED FROM TAKING ENFORCEMENT ACTION AGAINST PLAINTIFFS** ................................... 9

     **A. THE ALLEGATIONS, TAKEN AS TRUE, STATE A PLAUSIBLE CLAIM THAT THE DOJ REPRESENTED THAT THOSE IN COMPLIANCE WITH STATE LAW WOULD NOT BE PROSECUTED NOR WOULD THEIR PROPERTY BE SUBJECT TO FORFEITURE** .................................................................... 11

     **B. THE ALLEGATIONS, TAKEN AS TRUE, STATE A PLAUSIBLE CLAIM THAT JUDGE FOGEL ACCEPTED THE DOJ REPRESENTATIONS THAT A NEW FEDERAL ENFORCEMENT POLICY WAS NOW IN PLACE, PERMITTING MARIJUANA POSSESSION AND DISTRIBUTION IN COMPLIANCE WITH STATE LAW** ......................................................................................... 13

     **C. THE ALLEGATIONS, TAKEN AS TRUE, STATE A PLAUSIBLE CLAIM THAT DOJ WOULD DERIVE AN UNFAIR ADVANTAGE BY AVOIDING DISCOVERY IN <u>WAMM</u> BY ITS QUICKLY ABROGATED REPRESENTATIONS TO JUDGE FOGEL** .................................................................................................. 16

  **IV.** **PLAINTIFFS HAVE A NINTH AMENDMENT AND SUBSTANTIVE DUE PROCESS RIGHT TO DISTRIBUTE, POSSESS AND USE MEDICAL CANNABIS** .................................................................................................. 17

     **A. OVERVIEW OF THE FUNDAMENTAL RIGHT TO USE CANNABIS FOR MEDICAL PURPOSES** ......................................................................... 17

     **B. THE 9TH CIRCUIT IN <u>RAICH II</u> OPENED THE DOOR TO A FINDING OF A FUNDAMENTAL RIGHT TO USE CANNABIS FOR MEDICAL PURPOSES** ... 17

i

V.      THE TENTH AMENDMENT ISSUE IS DISTINCT FROM THE COMMERCE
        CLAUSE DECISION IN GONZALES V. RAICH ………………………………... 21

VI.     THE GOVERNMENT'S CLASSIFICATION OF CANNABIS AS HAVING NO
        MEDICAL VALUE PURSUANT TO THE CSA'S SCHEDULING SCHEME, IS
        NOT RATIONALLY BASED AND THUS, IMPERMISSIBLY DISCRIMINATES
        AGAINST MEDICAL CANNABIS PATIENTS THROUGH ITS ABSOLUTE
        PROHIBITION AGAINST MEDICAL USE ……………………………………… 22

CONCLUSION ………………………………………………………………………... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

**Cases**

Abbot Laboratories v. Gardner, 387 U.S. 136 (1967) ............................................ 5

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)................................................. 8, 9, 21

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1979) ................... 5, 6

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)....................................... 8, 9, 21

Gonzales v. Raich, 545 U.S. 1, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005) ...................................... 21, 22

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007)................................................. 9

Jacobus et al. v. State of Alaska et al., 338 F.3d 1095 (9th Cir. 2003) ..................... 6

Jenks v. State, 582 So. 2d 676 (1991) ........................................................... 20

Lawrence v. Texas, 539 U.S. 558 (2003) ...................................................... 21

New York v. United States, 505 U.S. 144,157 (1977) ....................................... 22

Pennington v. State, 54 S.W. 3d 852 (2001) .................................................. 20

Raich v. Gonzales, et al., 500 F.3d. 850 (9th Cir. 2007) ............................... passim

Thomas v. Anchorage Equal Rights  Comm'n, 220 F.3d 1134 (9th Cir.2000)........................... 5, 6, 7, 8

United States v. Leary, 395 U.S. 6 (1969)................................................. 10, 19

United States v. Lopez, 514 U.S. 549 (1995) ................................................. 22

United States v. Oakland Cannabis Buyers' Co-op, 532 U.S. 483 (2001)....................... 22

United States v. Randall, 104 Daily Wash L. Rptr. 2249, DC Super. Ct. (1976) ................. 20

United States v. W. T. Grant Co., 345 U.S. 629 (1953) ................................... 12, 13

Washington v. Glucksberg, 521 U.S. 702 (1997)........................................... 17, 18

**Statutes**

26 U.S.C. §4753 ............................................................................. 17, 19

Arizona, (Proposition 203) (2010) ............................................................ 20

California (Proposition 215) (1996) .......................................................... 20

Colorado (Ballot Amendment 20) (2000) ................................................... 20

Compassionate Use Act................................................................................. 17

Controlled Substance Act ....................................................................... passim

Delaware (SB17, HB 17-4)(2011) ............................................................. 20

District of Columbia (Amendment Act B18-622) (2010) ........................... 20

Maine (Ballot Question 2) (1999) ............................................................ 20

Marijuana Tax Act at 26 U.S.C. §§4742 (b)(1)-(2).................................... 10

Michigan (Proposal 1) (2008) ................................................................ 20

New Jersey (SB 119, HB 25-13) (2010) ..................................................... 20

New Mexico (SB 523, ,HB 32-3) (2007) ................................................... 20

**Rules**

Fed. R. Civ. P. 12 (b) (6) ...................................................................... 8

Fed. R. Civ. P. 8(a)................................................................................. 8

iv

## STATEMENT OF FACTS

### A. RIPENESS

On October 7, 2011, the United States Attorneys ("USAs") for the four districts of California announced a statewide crackdown on medical cannabis cooperatives and collectives.  *See*, Jennifer Medina, *U.S. Attorneys in California Set Crackdown on Marijuana*, N.Y. Times, October 7, 2011, at A-10 (RJN, Exh. 1).  Andre Birotte, Jr., the USA for Los Angeles stated "[t]his is not what the California voters intended or authorized…it's illegal under California law."  This is but one of several statements in which the four USA's used the press to threaten all cooperatives and collectives across the state of California.  Amended Complaint, ¶¶ 18-20.[1]

Plaintiff Conejo Wellness Center Cooperative, Inc. (herein "CWC"),  is a medical cannabis facility made up of patients which operates pursuant to California Health and Safety Code section 11362.775 and according to the California Attorney General's "Guidelines for Security and Non-Diversion of Marijuana Grown for Medical Use".  This patient association is located at 30101 Agoura Court, Suite 122, Agoura Hills, CA. ¶8.  The Executive Centers of Simi Valley, LLC (herein "ESCV") is also a Plaintiff and is the owner of the property at which Conejo operates its medical cannabis facility. ¶7.  While neither of these two plaintiffs received a letter from the local US Attorney, both fear prosecution and forfeiture. ¶20.

In their letters, the USAs threaten criminal prosecution, imprisonment, fines and forfeiture of assets, including the real property on which the cooperative operates.  Additionally, the USAs threaten seizure and forfeiture of any money received from a cooperative or collective. Coupled with the broad reaching public announcements made by the USAs, Plaintiffs in the present case felt, and continue to feel, that they have no choice but to close their doors. ¶¶ 18-20.  In addition to the New York Times article described above, the USA office for the Central District of California issued two press releases on October 7, 2011.  See, http://www.justice.gov/usao/cac/Pressroom/2011/144a.html; See also, http://www.justice.gov/usao/cac/Pressroom/2011/144.html (herein "USA Press Release"). RJN,

---

[1] All further "¶" references are to paragraphs in the Amended Complaint unless otherwise indicated.

1

Exh. 2.  USA Melinda Haag stated, "[a]lthough our initial efforts…focus on only certain marijuana stores, <u>we will almost certainly be taking action against others.  None are immune from action by the federal government."</u> <u>Id</u>. (Emphasis supplied)  In addition to these wide reaching threats of enforcement, the USA for the Central District stated that it would focus on cities in which residents and officials have expressed vocal opposition to cannabis cooperatives.  As the facts below show, CWC is precisely the type of cooperative targeted by Defendant.

On or about October 14, 2010, sheriff's deputies raided the CWC and seized medicine, computers and surveillance tapes.  See, Reza Gostar, *Medical Marijuana Dispensary Plans to Keep Growing,* Agoura Hills Patch, October 15, 2010 at http://agourahills.patch.com/articles/behind-the-scenes-agoura-hills-medical-marijuana. RJN, Exh. 3.  This action was not based on CWC's failure to be in compliance with state law, but rather because the city of Agoura Hills desires the shutdown of CWC.  The city has also expressed its intent to close CWC by using its zoning powers where criminal penalties are unavailable. Thus, as the target of government opposition on the local level, CWC is now the type of cooperative expressly targeted by the USAs in their October 7, 2011 press release.[2]

In the public announcements made by the USAs, the Defendant notes numerous prosecutions that have already taken place.   See, USA Press Release, supra.  In addition to those prosecutions and shut-downs made public, the USAs have sent letters to cooperatives and collectives across the Central District.  As an example, on October 6, 2011, all but one of the medical marijuana cooperatives and collectives in Upland, California, including the Lockeroom Collective, received threats of forfeiture and criminal prosecution and closed their doors. RJN, Exh. 4.  Additionally, Green Cross Foundation, a Pomona medical cannabis cooperative received a letter also threatening criminal prosecution, seizure of money and forfeiture and closed their doors. RJN, Exh. 5.

## B.  JUDICIAL ESTOPPEL

Prior to October, 2009, the government's motion to dismiss the Tenth Amendment Cause of Action in <u>County of Santa Cruz, WAMM, et. al. v Eric Holder et al.</u>, No. 03-1802 ("<u>WAMM</u>") had

---

[2] And, as docket no. 33-1 filed by the defendants illustrates, Conejo was also subject of a court-ordered shut down sought by the City of Agoura Hill, presumably in cooperation with federal authorities.

2

1   been denied; the next procedural step in that litigation was discovery, including the depositions of the

2   named plaintiffs.  Plaintiffs in that case were medical cannabis patients, later joined by Santa Cruz

3   county, and sought protection from federal interference with their use of cannabis as a medicine.

4        In WAMM, the Government filed a pleading, Attaching Medical Marijuana Guidance as an

5   Exhibit on October 9, 2009. RJN, Exh. 6.

6        At a Status Conference on October 30, 2009[3], the government represented: (a) that the

7   plaintiff's 10th Amendment Claim was moot because of the promulgation of a new government policy

8   that gave guidance as to what medical marijuana possession and distribution "could go forward"; (b)

9   as a result, the government would now win a new motion to dismiss that count; (c) there was no

10  reasonable expectation that the new policy would be abrogated (phrased as the government's ability to

11  hurdle the barrier of the voluntary cessation doctrine); and (d) the plaintiff had reached their litigation

12  goals and the case should be dismissed.

13       The old government policy, which the DOJ lawyers represented had been replaced, "had made

14  it impossible for local communities to know… what activities would be targeted under federal law,

15  and what activities could go forward." (Emphasis supplied).  Id.  The DOJ lawyer represented that the

16  new federal policy cured the defects of the old policy so that the case was now in a completely

17  different posture because of the promulgation of the new policy that gave notice of what activities

18  "could go forward".  Activities that "could go forward" meant, in context, those possessions and

19  distributions of marijuana that could be safely undertaken without fear of federal prosecutions or

20  forfeiture actions.

21       Plaintiff's counsel agreed that there was no further reason to litigate, if the government

22  "follows the policy that has recently been announced."

23       The letters from the United States Attorney, referenced above, are in direct conflict with the

24  representations made to Judge Fogel that there was a new federal enforcement policy that identified

25  marijuana possession and distribution "that could go forward".  Those letters threaten the possibility

26

27  ───────────────
    [3]    The representations are contained in the transcript of the status conference on October 30, 2009. RJN, Exh. 7.

28

3

of prosecution and forfeiture actions for *any* distribution of marijuana, and specifically state that there are *no* marijuana possessions or distributions that do not violate the federal Controlled Substance Act; the doing of which would subject a person to prosecution and forfeiture.

Judge Fogel accepted that the new government policy made settlement appropriate as long as "it would be conditioned upon the government following the Guidance or something like that…"

The government would derive an unfair advantage if it avoids the discovery process in WAMM based on its representation that a new federal enforcement policy concerning medical marijuana had been promulgated that allowed communities to know what possession and distribution of marijuana "can go forward", and then is allowed to pretend there was no new policy, as evidenced by the letter-threats from the US Attorneys.

## C. EQUAL PROTECTION

The federal government's approach to gaining scientific knowledge about medical cannabis and its uses to treat humans has been to block its emergence as a subject of study and to block potential clinical applications, therefore preventing patients from accessing this drug.  [The court is asked to take judicial notice of paragraphs 3-21 of the Declaration of Dr. Rick Doblin filed in support of the motion for preliminary injunction (Docket #12) , outlining federal procedures for obtaining medical grade cannabis for research and the procedural aspects of the Craker litigation**,** attached as RJN, Exh. 8**.**]  For example, as footnote 6 of plaintiff's amended complaint notes, representatives of the National Institute for Drug Abuse rarely permit research into cannabis applications and when they do, the few approved research projects are designed to highlight the negative components of the drug. In contrast, there is a veritable mountain of peer reviewed scientific evidence of the substantial medical value of marijuana.  As a result there has been a call from the scientific community, that has reached the political arena, to have the law reflect what is scientifically true.  The California Medical Association ("CMA"), the nation's largest state-organization of medical professionals, recently announced its policy position that medical cannabis should be re-scheduled (currently on Schedule I, which means no medical value) to recognize its medicinal qualities ("Cannabis and the Regulatory Void", October, 2011, ¶17.  Other medical associations have made similar public statements.  At least

4

1    two governors have formally requested re-scheduling of cannabis within the past month (Chaffee or

2    RI and Gregoire of WA) while a third, Shumlin of VT, announced he would join that petition in early

3    December, 2012.  RJN, Exh. 9. Meanwhile, the Veterans Administration, another branch of

4    defendant's federal system, announced over a year ago, in July of 2010, that veterans treated at VA

5    centers around the country with opioids would be allowed to continue that treatment even if also using

6    cannabis.  RJN, Exh. 10.  Hundreds of studies, mostly conducted outside of the United States, clearly

7    show the medical value of cannabis to treat illness and alleviate pain.  (Declaration of Paul

8    Armentano, Docket #14, RJN Exh. 11.)  Cannabis is overseen by the Drug Enforcement Agency, not

9    the FDA, a fact which is noted in the CMA's Policy paper and to which the CMA takes exception.

10                                        **ARGUMENT**

11        **I.    PLAINTIFFS' CLAIMS ARE RIPE.**

12            Defendant has erroneously asserted that Plaintiffs' claims are not ripe for this Court to review

13    pursuant to Article III of the U.S. Constitution.  There are two "components" for a Court to consider in

14    determining ripeness:  (1) the constitutional "case or controversy" component, and (2) the prudential

15    component.  Thomas v. Anchorage Equal Rights  Comm'n, 220 F.3d 1134, 1139 (9th Cir.2000) (en

16    banc) ("Thomas").

17            In analyzing the constitutional component, the Court considers "whether the plaintiffs face 'a

18    realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement,'

19    [citation omitted] or whether the alleged injury is too 'imaginary' or 'speculative' to support

20    jurisdiction, quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1979).  In analyzing

21    the prudential component of ripeness the court considers, "the fitness of the issues for judicial decision

22    and the hardship to the parties of withholding court consideration."  Id at 1141, quoting Abbot

23    Laboratories v. Gardner, 387 U.S. 136, 149 (1967).  Defendant's argument focuses solely on the

24    constitutional component, implicitly conceding the prudential component.  However, Plaintiff meets

25    both aspects of the ripeness analysis.

26            //

27            //

28

### A.  PLAINTIFFS SATISIFY THE CONSITITUTIONAL COMPONENT OF THE RIPENESS ANALYSIS

### 1.  OVERVIEW OF RIPENESS STANDARD

Where there is a credible threat of prosecution a Plaintiff is "not required to await and undergo a criminal prosecution as the sole means of seeking relief." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).  Courts look to: (1) whether the plaintiffs have articulated a concrete plan to violate the law in question; (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement under the challenged statute. Thomas, at 1139.  Defendant's sole argument is that Plaintiffs fail the second prong of the Thomas test because they face no specific threat of enforcement, and thus their claims are unripe.

### 2.  PLAINTIFFS SATISFY ALL 3 PRONGS OF THE RIPENESS TEST PARTICULARLY SINCE PLAINTIFFS ARE UNDER  IMMINENT THREAT OF ARREST, PROSECUTION AND FORFEITURE

The only part of the Thomas analysis expressly discussed in Defendant's motion is the second prong: whether the prosecuting authorities have communicated a threat to initiate proceedings. Defendants assert that because Plaintiffs have not received one of the USA's  "cease and desist" letters, there has been no specific warning or threat.  However, the Court's analysis from Thomas does not require a specific threat.  Rather, "the threat of enforcement must at least be 'credible,' not simply 'imaginary or speculative.'"  Thomas, at 1140.  Indeed the Ninth Circuit has ruled a case ripe for prosecution where there was no specific threat but still enough facts to indicate future enforcement. Jacobus et al. v. State of Alaska et al., 338 F.3d 1095 (9th Cir. 2003).

Despite the fact that the USA has issued a threat of imminent enforcement both to specific parties in the state and more broadly to **every medical cannabis cooperative and collective** through the media, defendants assert that there is "insufficient history, at this stage, to establish a likelihood that any Plaintiff here might receive such a warning in the future.  (Defendants' Memorandum in Support of Motion to Dismiss filed as Docket #26 on 11/21/2011 [hereinafter cited as "Def.Mem."], p. 10:4-6.)  On October 7, 2011, the four US Attorneys (USAs) for the districts of California announced a statewide crackdown on medical cannabis cooperatives and collectives. See: Jennifer

6

Medina, *U.S. Attorneys in California Set Crackdown on* Marijuana, N.Y. Times, October 7, 2011 , at A10 (RJN, Exh. 1).  There, the Central District USA office stated that that office's efforts would focus on cities where residents and officials have expressed vocal opposition to cannabis cooperatives.

Plaintiff Conejo Wellness Center ("Conejo"), operates directly across the street from Agoura Hills City Hall. On or about October 14, 2010, sheriff's deputies raided Conejo and seized medicine, computers and surveillance tapes. See: Reza Gostar, *Medical Marijuana Dispensary Plans to Keep Growing*, Agoura Hills Patch, October 15, 2010 at http://agourahills.patch.com/articles/behind-the-scenes-agoura-hills-medical-marijuana. RJN, Exh. 3. The Agoura Hills Assistant City Manager and City Councilmembers have expressed a desire to see Conejo closed down.  The city also expressed an intent to close Conejo using its zoning powers when criminal penalties are unavailable. Having been the target of express opposition, Conejo, meets the very definition of targeting by Defendants.

This is precisely the kind of "active enforcement" of the statute that renders Plaintiffs' fears eminently reasonable. Thomas, supra*, at 1140.  Given the past history of enforcement, the Plaintiffs' current actions, and the imminence of the threat against Plaintiffs, Plaintiffs satisfy the second prong of the Thomas analysis.

Like the first prong, Defendants also implicitly concede and Plaintiffs easily show satisfaction of the third prong.  The Plaintiffs in the present case "have gone far beyond the requirement that they articulate a concrete plan" to violate the law and are currently operating a medical cannabis cooperative, and have been doing so for over five years.  The government did not, and could not, muster an argument that the history of past prosecution and enforcement of the CSA was insufficient for plaintiffs to pass muster on the third prong of the Thomas test.  The USAs have announced their intent to take immediate action. Dozens of other cannabis cooperatives have received threatening letters throughout California and the government has initiated forfeiture proceedings in Northern California against the landlord of a plaintiff in a similar case filed in the Northern District. [See, USDC-NDCA case No. 3:11-cv-05596-JW, RJN Exh. 12]  Furthermore, federal law enforcement agencies have conducted raids on cannabis cooperatives throughout the past decade. As such, Plaintiffs face a realistic danger of sustaining a direct injury through enforcement of the CSA such that

7

the "injury" in this case is not too imaginary or speculative to support jurisdiction.

**B. PLAINTIFFS SATISFY THE PRUDENTIAL COMPONENT OF THE RIPENESS ANALYSIS**

In evaluating the prudential aspects of ripeness, judicial analysis is guided by two overarching considerations: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. Id. at1141. "A concrete factual situation is necessary to delineate the boundaries of what conduct the government may or may not regulate." Id. The facts of this case are well-developed and well-understood. There are no missing facts that would or would not make this case easier to decide. This case is not built upon hypotheses or conjecture. Rather it is based in the very real fear of threat of prosecution stemming from both the words and deeds of the Central District USA.

The hardship on the Plaintiffs if jurisdiction is denied will be great. Because the threat of prosecution looms over them, the Plaintiffs must live in constant fear of harassment, forfeiture and imprisonment. The Defendants are not being asked to defend their action in a vacuum. USA Birotte's office specifically stated that it would be going after cooperatives just like Conejo's. Thus, the hardships weigh in favor of granting jurisdiction to Plaintiffs' claims and allowing this case to proceed on the merits.

Because Plaintiffs have a real and reasonable fear of prosecution, because the factual record is sufficient to proceed, and because the hardships weigh in favor of Plaintiffs, this case is ripe for adjudication.

**II. PLAINTIFFS HAVE PLED FACTS SUFFICIENT TO STATE A CAUSE OF ACTION**

Fed. R. Civ. P. 12 (b) (6) permits a party to move the court to dismiss an action if the plaintiff fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 8(a) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court's decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), have clarified how the sufficiency of a complaint is to be evaluated under Rule 8. Under these cases, there are two essential requirements for a

pleading: that its allegations are sufficient and that its allegations are plausible.

In evaluating the sufficiency of a complaint under Twombly and Iqbal, a district court must engage in a two-step process. First, the court must begin by "identifying allegations in the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 129 S. Ct. at 1949. In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Second, the court must decide whether the remaining allegations in the complaint—taken as true—state a "plausible claim for relief." Id. (quoting Twombly, 550 U.S. at 570). This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense" to decide whether the facts "permit the court to infer more than the mere possibility of misconduct." Id. at 1950 (citing Iqbal v. Hasty, 490 F.3d 143, 157 (2d Cir. 2007). In essence, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949.

### III. THE GOVERNMENT IS JUDICIALLY ESTOPPED FROM TAKING ENFORCEMENT ACTION AGAINST PLAINTIFFS

We agree with the government's formulation of the elements required for the application of the doctrine of Judicial Estoppel to the "facts alleged in the Complaint, documents attached to or relied upon in the complaint, and matters of which the Court may take Judicial Notice." (Def.Mem. 9). Those elements are: (1) a party's later position is clearly inconsistent with its earlier position; (2) a court has previously accepted that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. (Id. at 11).

As applied to the Plaintiff's Complaint those elements are:

(a) The position articulated in the letters from the United States Attorney for the Central District of California (US Attorney) to landlords and dispensary operators is inconsistent with the representations of the Department of Justice (DOJ) lawyers to the United States District Court (Judge Jeremy Fogel), upon which the 2009 settlement in WAMM was based;

9

(b) Judge Fogel accepted the DOJ representations in <u>WAMM</u>.  Therefore, any later judicial acceptance of (implementation; failure to reject) the threats contained in the letters from the US Attorney would create the impression that Judge Fogel in <u>WAMM</u> was misled; and

(c) The DOJ would derive an unfair advantage, if not estopped, by making representations of a changed position in <u>WAMM</u> in order to settle that matter and to avoid discovery, including the depositions of the named defendants, while failing to now adhere to that new position without filing an appropriate pleading in the <u>WAMM</u> matter.

It does not appear that the government is claiming that the facts alleged in the complaint, (as augmented by the documents attached and relied upon including the transcript of the October 30, 2009 status conference in <u>WAMM</u>) are threadbare recitals supported by mere conclusory allegations – nor could that be done with integrity.  Rather, it appears that the government argues that the allegations do not state a plausible claim for relief.  The government acknowledges that these allegations must be accepted as true for decision on this motion (Def.Mem. 9), and then argues that the allegations are false or not plausible.

The guts of the government argument is "Plaintiffs are simply wrong in asserting that the Department [DOJ] has ever issued a promise or guarantee, in any prior judicial proceeding, that the CSA[4] would never be enforced against those who distribute marijuana simply because they claim[5] to comply with state law."  The government further contends that Judge Fogel in <u>WAMM</u> did not "accept" the DOJ representation that the Medical Marijuana Guidance was a change in government policy that would protect those in compliance with State law from criminal prosecution and forfeiture suits.  Finally, the government states that the "plaintiffs cannot show that DOJ would derive an unfair advantage" from settling <u>WAMM</u> upon express representations and then ignoring those

---

[4]      The federal Controlled Substance Act, which criminalizes possession, use and distribution of marijuana and recognizes no exception for medical use, is unlike the earlier Marijuana Tax Act of 1937, Pub. L. No. 75-348, 50 Stat. 551 (repealed 1970) which the court found unconstitutional in <u>US v. Leary</u>, 395 U.S. 6 (1969), due to the compelled self-incrimination component of that Act's registration scheme.

[5]      Of course the issue is not about those who "claim to be in compliance with State law."  The issue is for those who <u>are</u> in compliance with State law.  It is worth noting that the letters from the US Attorney state (in the only boldface within the letter) that "it is not a defense to either the referenced crime or to the forfeiture of property that the dispensary is providing medical marijuana." (Compliance with State law is dramatically absent from the letters).

10

representations in its actions against Californians who are, just like <u>WAMM</u>, in compliance with State law.

**A.  THE ALLEGATIONS, TAKEN AS TRUE, STATE A PLAUSIBLE CLAIM THAT THE DOJ REPRESENTED THAT THOSE IN COMPLIANCE WITH STATE LAW WOULD NOT BE PROSECUTED NOR WOULD THEIR PROPERTY BE SUBJECT TO FORFEITURE**

The government argues that the representations made on the record in open court to Judge Fogel, which are the basis for the settlement in <u>WAMM</u>, "did not purport to affect any party's conduct outside the courtroom – much less federal enforcement policy throughout the entire State of California. Plaintiff's argument is based on a 'promise' that was never made…" (Def.Mem. 2).  A review of the transcript demonstrates the government's claim is wrong.

On October 30, 2009 – at the first court appearance after the government had filed the <u>WAMM</u> pleading which included the Medical Marijuana Guidance as an exhibit  that announced the new government enforcement policy — the government explained to Judge Fogel that the filing made the <u>WAMM</u> Tenth Amendment complaint moot, and, therefore, subject to another motion to dismiss[6]. Representing the government, DOJ lawyer Quinlivan explained to Judge Fogel:

> MR. QUINLIVAN: I think from the defendant's [the named government officials] perspective this case is moot. You know, the theory of the plaintiffs 10th Amendment claim is that <u>the prior administration had, in effect, a policy of selective enforcement in applying the Controlled Substances Act in California that made it impossible for local communities to know what was --what activities would be targeted under federal law and what activities could go forward. We are in a completely different posture now; given The Guidance issued by the Attorney General.</u>

(transcript of the October 30, 2009 proceeding, at 3-4, RJN Exh. 7 (Emphasis supplied).

The DOJ represented that the Medical Marijuana Guidance promulgated by DOJ, and then filed as an exhibit denoting and establishing the changed government enforcement policy with regard to those in compliance with state medical marijuana laws, provides local California communities (obviously not only the parties to the <u>WAMM</u> lawsuit) with notice of what type of marijuana

---

[6]     The government's motion to dismiss that count had previously and recently been denied.

11

possession and distribution would be prosecuted under federal law, "*and what activities could go forward*." The DOJ lawyer in <u>WAMM</u> pointed out that the status of the law suit was in "a completely different posture" because of the new government policy ("The plaintiffs would be seeking to enjoin …a policy that is in the past."), which delineated what marijuana-related conduct was now lawful.

The CSA bans all marijuana possession and distribution even if for medical purposes, as the USAs makes clear in their letters. The US Attorney letters state that <u>every</u> possession and distribution of marijuana is a violation of the CSA. Completely contrary to the threats in the letters are the representations that were made to Judge Fogel in <u>WAMM</u> of the new government enforcement policy that carves out marijuana possession and distribution "that can go forward." Those words "<u>can go forward</u>" have only one meaning: activity which can be <u>lawfully</u> undertaken without fear of being prosecuted or having one's property seized and forfeiture attempted. Reviewing the Medical Marijuana Guidance, there is no other meaning possible.

The DOJ position in <u>WAMM</u> was that the Medical Marijuana Guidance was a changed governmental policy that caused the <u>WAMM</u> plaintiff's 10th Amendment claim to become moot, and therefore subject to a motion to dismiss. The DOJ lawyer told the court and <u>WAMM</u> plaintiffs:

> [S]o I fail to see how we really — any kind of litigation about what happened in the past would have no bearing whatsoever in terms of trying — <u>the plaintiffs would be  seeking to enjoin, basically, a policy that is in the past.</u>...
>
> But, otherwise [if no settlement], you know, we are willing to brief the question about whether or not this is moot. <u>And the main issue on that would  simply  be  whether  the  voluntary  cessation  doctrine  would apply, given this change. I think we could get past that barrier</u>.

<u>Id.</u> at 4-5. (Emphasis supplied).

Thus, the DOJ in <u>WAMM</u> represented to Judge Fogel that the case was moot because the government could, and would, demonstrate that there was no reasonable expectation that the wrong (the prosecution and seizure of the property of those in compliance with State law) would be repeated. <u>United States v. W. T. Grant Co.</u>, 345 U.S. 629, 632-33 (1953) (internal citations omitted):

> [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot. [ ] A controversy may remain to be settled in such

12

circumstances, [ ] e. g., a dispute over the legality of the challenged practices. [ ] The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. ⸢ For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement....

The case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated. ... Such a profession does not suffice to make the case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now discontinued acts.

(Emphasis supplied).

The DOJ counsel also pointed out the public nature of the dissemination of the Medical Marijuana Guidance ("It's on the department's website"). Id. at 4. This further demonstrates that the change in policy was aimed at the body politic, not just the parties to the WAMM litigation.

The government cites cases interpreting the significance of the Ogden Memo, apart from, and unconnected to, the context of the WAMM settlement and the government's representations to Judge Fogel. That authority is wholly irrelevant to the issues raised by these plaintiffs in the First Cause of Action. The government completely ignores the representations made by the Department of Justice (DOJ) lawyers to the presiding federal judge in WAMM that are far stronger than the actual language in the Medical Marijuana Guidance. The DOJ also ignores the significance of its confident representation that it could now win a motion to dismiss the remaining count of the complaint in WAMM (previously denied) since the litigation had become moot because of the new policy, and that the government could (whether briefed or not) meet the strictures of the voluntary cessation doctrine that the new policy would endure. Thus the complaint in the matter at bar states a plausible claim that the DOJ represented that those in compliance with California state law would neither be prosecuted nor have their property seized as the subject to forfeiture. This complaint is not subject to dismissal.

### B. THE ALLEGATIONS, TAKEN AS TRUE, STATE A PLAUSIBLE CLAIM THAT JUDGE FOGEL ACCEPTED THE DOJ REPRESENTATIONS THAT A NEW FEDERAL ENFORCEMENT POLICY WAS NOW IN PLACE, PERMITTING MARIJUANA POSSESSION AND DISTRIBUTION IN COMPLIANCE WITH STATE LAW

The government claims that Judge Fogel did not "accept": (a) the government's representation

13

1    of the new enforcement policy; (b) its argument it would win a dismissal because the new policy had

2    mooted out the <u>WAMM</u> plaintiffs claims; and, (c) that the government would win that motion to

3    dismiss because it could "get past the barrier" of the voluntary cessation doctrine since the new policy

4    was enduring.  The government argues that there is no judicial acceptance because there is a provision

5    in the Settlement that permits the WAMM plaintiffs to reopen the case at the point where it was

6    suspended, if the DOJ advised the Court it was renouncing its new policy.  The government ignores

7    the procedural context of the potential motion to dismiss based on mootness and the DOJ's

8    representation to court and WAMM of its ability to "get past the barrier" of voluntary cessation.  Once

9    again, a review of the October 30, 2009 transcript reveals that Judge Fogel did accept DOJ's new

10   position.

11        The procedural posture of the <u>WAMM</u> litigation is important for an understanding of the

12   significance of the government's position, the Court's acceptance of it and the unfair advantage the

13   government will derive, if not now estopped from a *volte-face*.  The government's motion to dismiss

14   the <u>WAMM</u> Tenth Amendment Counts had been denied, and discovery, including the deposition of

15   the named Defendants, was about to commence.  The government sought to avoid that discovery by

16   converting the Ogden Memo into a changed governmental policy that met the voluntary cessation

17   doctrine, which then would give rise to a new motion to dismiss the Tenth Amendment Claim as

18   moot.

19        Plaintiff's counsel in <u>WAMM</u> understood: "I don't really see why we should brief and argue

20   and have the Court decide the issue of mootness when I do think we have an agreement, perhaps in

21   principle, of the idea that there is no need to litigate this case <u>so long as the federal government</u>

22   <u>follows the policy that has recently been announced.</u>" <u>Id.</u> 5-6. (Emphasis supplied).

23        Plaintiffs' counsel also understood that the <u>WAMM</u> plaintiffs had achieved all they sought in

24   litigation by the DOJ's representations of a change in enforcement policy.  The government is

25   disingenuous to say that the <u>WAMM</u> plaintiffs felt no need to continue the litigation because of an

26   internal memo "which described a general view regarding prosecutorial priorities and resources."

27   (Def.Mem. 13).  As the transcript makes clear, the plaintiffs and the government settled the case

28

1  because it was expressly agreed that the DOJ position of the formulation of a new enforcement policy

2  actually did make the <u>WAMM</u> litigation position moot.  Judge Fogel and <u>WAMM</u> took DOJ at its

3  word.

4         The DOJ lawyer recognized that absent an enduring new policy that made it clear to the local

5  communities what marijuana possession and distribution "could go forward" without being federally

6  prosecuted or be the basis for forfeiture, the <u>WAMM</u> plaintiffs would desire to move forward with

7  discovery.

8         I think their [plaintiffs] primary concern is that if something were to
       change and they were to reopen the suit, they don't want to necessarily
9      start from square one.

10        THE COURT:  Right.  It would have to be conditioned upon the
       government following the Guidance or something like that....

11  (RJN Exh. 7, Transcript at 5).

12        THE COURT:  What we are really talking about, I think, is wordsmithing
       a dismissal.

13

14        MR. QUINLIVAN:  I think that's right. ... I agree it's preferable we try to
       reach that resolution than necessarily brief mootness...

15  (<u>Id.</u> at 7).

16        THE COURT:  ...You are almost like abating the case.  You are just,
       technically it would be a dismissal, I suppose, but what you are talking

17     about is an abatement and it <u>would not be unabated unless and until the</u>

18     <u>government didn't follow its policy.</u>  There would have to be a showing.

19  (<u>Id.</u> at 8) (Emphasis supplied).

20        It is self-evident from the transcript that not only Judge Fogel, but also the <u>WAMM</u> plaintiffs

21  accepted the government's representations of a new enforcement policy.  If the government can,

22  without returning to the <u>WAMM</u> litigation to announce the termination of its new policy, prosecute

23  and forfeit the property of those in compliance with State law; there can be no doubt that Judge Fogel

24  will have been misled by the government's representations.  The DOJ has thus far failed to announce the

25  abrogation of the marijuana enforcement policy announced in the Medical Marijuana Guidance by

26  making any further filing or appearance in <u>WAMM</u>.  That is an option that the government has, though it

27  would obviously be both an embarrassment to do so, in light of its advocacy that it could meet the

28  strictures of the voluntary cessation doctrine, as well as highly undesirable because discovery and

15

depositions in <u>WAMM</u> would then resume.

**C. THE ALLEGATIONS, TAKEN AS TRUE, STATE A PLAUSIBLE CLAIM THAT DOJ WOULD DERIVE AN UNFAIR ADVANTAGE BY AVOIDING DISCOVERY IN <u>WAMM</u> BY ITS QUICKLY ABROGATED REPRESENTATIONS TO JUDGE FOGEL**

It was no secret that DOJ sought to avoid the discovery phase of the <u>WAMM</u> litigation to follow the Court's denial of the DOJ motion to dismiss the <u>WAMM</u> plaintiffs' Tenth Amendment Count.  This led the DOJ to: (1) file a pleading that announced a new enforcement policy that would advise Californians of what marijuana distribution and possession would not be prosecuted or lead to forfeiture attempts; (2) announce it would file another motion to dismiss; this time based on the mootness caused by the announcement of the new policy; (3) settle the case based on its representations of the existence of a new enforcement policy, which actually did make the <u>WAMM</u> litigation goals moot.

The government "has its cake and eats it too" if it avoids the discovery based on its new policy, and then is allowed to pretend there was no new policy, as evidenced by the letter-threats from the US Attorneys.

The letters sent by the United States Attorney threatening prosecutions and seizures of those operating within California's medical marijuana program (without limitation or protection for those in compliance with State law) are clearly inconsistent with the DOJ's representations to Judge Fogel. Such prosecution or seizure would demonstrate that Judge Fogel was misled by the government's representation that there was a new government policy in place that had every appearance of being permanent and was represented by the DOJ as such. To permit the government to avoid the discovery it was facing in <u>WAMM</u> by representing that there was a new and permanent enforcement policy, fail to make any application or announcement to the <u>WAMM</u> court, yet have the United States Attorney act in dramatic contravention of the new policy by threatening prosecution and seizure of property from those, even if in compliance with State law, would give the government an unfair advantage.

The allegations, taken as true for the purposes of this motion, are more than plausible, and require denial of the government's motion to dismiss and, eventually, the application of the Judicial Estoppel doctrine.

16

**IV.   PLAINTIFFS HAVE A NINTH AMENDMENT AND SUBSTANTIVE DUE PROCESS RIGHT TO DISTRIBUTE, POSSESS AND USE MEDICAL CANNABIS**

**A.   OVERVIEW OF THE FUNDAMENTAL RIGHT TO USE CANNABIS FOR MEDICAL PURPOSES**

Clearly established principles of federalism related to fundamental rights, represented by a long line of cases, teaches that our citizens have a fundamental right to make decisions, with their doctors, about their choices for medical treatment.  What the federal government refuses to acknowledge, is that the legitimate, state-sanctioned use of marijuana for medical purposes in this country has a long, rich history, interrupted only by a brief 26 year period from 1970, when Congress passed the CSA, to 1996, when Californians passed the Compassionate Use Act (CUA).  That CUA actually restored the universally accepted exception for medical use found in all state and federal laws that otherwise criminalized the possession of marijuana (except for that 26 year period).   See, for example, 26 U.S.C. §4753 (now repealed) and, Raich v. Gonzales, et al., 500 F.3d. 850, 864-865 (9th Cir. 2007) (on remand) ("Raich II").   What this history demonstrates is that marijuana use for medical purposes is an accepted, safe treatment, and it was only the unconstitutional act of Congress in intruding on that right in 1970, that interfered with that right to use cannabis.  Even now, the medical establishment has come out in support of cannabis, most recently, the California Medical Association as noted above.

**B.   THE 9TH CIRCUIT IN RAICH II OPENED THE DOOR TO A FINDING OF A FUNDAMENTAL RIGHT TO USE CANNABIS FOR MEDICAL PURPOSES**

The government seeks to attribute more to Raich II (at 861-866) than what that Court said and then tries to exclude from that decision the precise language that supports Plaintiffs' Ninth Amendment and Substantive Due Process rights to possess, distribute and use marijuana lawful under California state law.  First, the government asks this Court to believe that Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) holds that the right to alleviate serious medical symptoms with the use of medical cannabis is not "deeply rooted in this Nation's history and tradition" Def.Mem. 16: 21-23. But, nowhere does Glucksberg say such a thing.

Then the government suggests that Raich II somehow holds that the use of marijuana is not "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if they

17

1  were sacrificed" (Id. at 16:7-11) and that there exists a "long history of federal regulation aimed to

2  limit or prohibit the use of marijuana for any purpose. Id. at 16:23-24. The government is wrong on

3  all three points.

4      First, four concurring opinions in Glucksberg strongly suggest that the Due Process Clause

5  protects an individual's right to obtain medical treatment to alleviate unnecessary pain. Justice

6  O'Connor's opinion (with which Justice Ginsburg concurred, Glucksberg, 521 U.S. at 789) makes

7  clear that suffering patients should have access to any palliative medication that would alleviate pain

8  even where such medication might hasten death. "[A] patient who is suffering from a terminal illness

9  and who is experiencing great pain has no legal barriers to obtaining medication, from qualified

10 physicians." Id. at 736-37 (O'Conner, J., concurring) (Emphasis supplied). Similarly, Justice Breyer's

11 concurrence suggests that a "right to die with dignity" includes a right to "the avoidance of

12 unnecessary and severe physical suffering." Id. at 790 (Breyer, J., concurring).

13     Second, the government's view of history is myopic at best. There are numerous studies that

14 document the long and historical use of marijuana as a therapeutic medicine, even dating back

15 thousands of years.[7] The first evidence of the medical use of marijuana was published during the reign

16 of the Chinese Emperor Chen Nung, more than five thousand years ago. Grinspoon, at note 1 at 1. By

17 the mid-nineteenth century, physicians in the United States were using marijuana for a wide variety of

18 medical purposes, and between 1840 and 1900, over one-hundred journal articles on the medical use

19 of marijuana were published. Id. at 4. In the twentieth century, moreover, physicians found marijuana

20 to be an effective treatment for a range of ailments, including: nausea and vomiting associated with

21 chemotherapy, weight loss associated with AIDS; glaucoma; epilepsy; muscle spasms and chronic

22 pain in cases of multiple sclerosis, quadriplegia and other spastic disorders; migraines; severe pruritus;

23 depression and other mood disorders; asthma, insomnia, dystonia, scleroderma, Crohn's Disease and

24 diabetic gastroparesis. Id. at 4 and note 1, at 163-222.[8]

25

26 [7]   See also, Declaration of Lester Grinspoon, M.D. in Support of the Brief of Amici Curiae National Organization for the Reform of Marijuana Laws (NORML) and the NORML Foundation, submitted to the U.S. Supreme Court in Ashcroft v. Raich, case no. 03-1454. Dr. Grinspoon is an associate professor of psychiatry at Harvard Medical School.  Exh. 13.

27

28 [8] For other evidence documenting contemporary therapeutic benefits of medical cannabis, see Declaration of Paul

18

1    In the face of such documented history, the government's claim that there is a "long history of

2    federal regulation" reveals itself, as it should, to be absurd. Yet, the government not only ignores

3    history, but fails to concede that the very appellate court it claims does not recognize that medical

4    marijuana is deeply rooted in this country's history and traditions says exactly the opposite, which is

5    that this Nation's long history and tradition actually embraced the use of medical cannabis, reflected in

6    both medical practices and in the Nation's laws, a vital requirement for the recognition of a

7    fundamental right.

8    For example, when the government passed the Marijuana Tax Act in 1937 (repealed), it

9    specifically exempted from registration (and the other reporting requirements of that Act), any

10    possession for medical use.  26 U.S.C. §4753.  Moreover, the Uniform Narcotic Drug Act, adopted by

11    almost every state in the Union, exempted patients from prosecution for marijuana possession.  See

12    footnote 16, U.S. v. Leary, *supra*.  The Court in Raich II recognized these critical facts:

13    
> It is beyond dispute that marijuana has a long history of use -- medically
> and otherwise -- in this country. Marijuana was not regulated under

14    
> federal law until Congress passed the Marihuana Tax Act of 1937, Pub.
> L. No. 75-348, 50 Stat. 551 (repealed 1970), and marijuana was not

15    
> prohibited under federal law until Congress passed the Controlled

16    
> Substances Act in 1970. See Gonzales v. Raich, 125 S. Ct. at 2202.
> There is considerable evidence that efforts to regulate marijuana use in

17    
> the early-twentieth century targeted recreational use, but permitted

18    
> medical use. *See* Richard J. Bonnie & Charles H. Whitebread, *The*
> *Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal*

19    
> *History of American Marijuana Prohibition*, 56 Va. L. Rev. 971, 1010,
> 1027, 1167 (1970) (noting that all twenty-two states that had prohibited

20    
> marijuana by the 1930s created exceptions for medical purposes). By
> 1965, although possession of marijuana was a crime in all fifty states,

21    
> almost all states had created exceptions for "persons for whom the drug

22    
> had been prescribed or to whom it had been given by an authorized
> medical person." Leary v. United States, 395 U.S. 6, 16-17, 89 S. Ct.

23    
> 1532, 23 L. Ed. 2d 57 (1969).

24    Raich II, at 864-865.  Moreover, a majority of states, explicitly recognizing the fundamental use of

25    marijuana to alleviate suffering and pain, continue to allow for either a medical necessity defense or

26    

27    Armentano, filed with Plaintiffs' initial TRO papers (Docket #14).  The court is asked to take judicial notice of that
declaration and the referenced studies.  RJN, Exh. 11.

28    

19

1    have instituted a therapeutic research program which allows for the use of cannabis.[9]

2         As the Raich II court then recognized, it was only with the passage of the Controlled

3    Substances Act in 1970, that Congress placed marijuana on Schedule I of the Controlled Substances

4    Act, taking it outside of the realm of all uses, including medical, under federal law.  Therefore, it was

5    only from 1970 to 1996, that the possession or use of marijuana – medically or otherwise – was

6    proscribed (except for medical necessity under some state laws) under state and federal law, a short

7    period of only 26 years, which proscription ended with California's passage of The Compassionate

8    Use Act of 1996. [10] Raich II, at 865.  In addition, the Raich II court also made clear that "[t]he mere

9    enactment of a law, state or federal, that prohibits certain behavior does not necessarily mean that the

10   behavior is not deeply rooted in this country's history and traditions. Id. at 865. fn. 14.

11        So, the government is very wrong to suggest, as it did, that the medical use of marijuana is not

12

13   ─────────────────────
     [9] States with medical cannabis laws on the books: AK, AR, CA, CO, DE, DC, HI, ME, MD, MI, MT, NV, NJ, NM, OR, RI, VT, WA.
     States with a medical necessity defense and/or Therapeutic Research Program codified in state statutes in effect: (NOTE:

14   Presence of a "Controlled Substances Therapeutic Research Act" (TRP) in state law, for the purposes of this list, generally means the state does not allow for the medical necessity defense, since TRP, commonly used by numerous states,

15   precludes the assertion of any defense if the defendant was not enrolled in a state program for the treatment of cancer or glaucoma.) DC: Defense available (see, United States v. Randall (104 Daily Wash L. Rptr. 2249, DC Super. Ct. 1976); FL:

16   Defense available (see, Jenks v. State, 582 So. 2d 676 (1991); GA: Defense available, but only for patients in the State's Therapeutic Research Program (TRP) established (GA ST S43-34-121) for side effects of chemotherapy and glaucoma

17   patients only; ID: Defense available, but only for simple possession; IL: TRP program in effect; IN: Defense available; IA: Defense available, but only if prescribed per State's Schedule II classification; LO:  TRP program in effect; MA, TRP in

18   effect; MS: defense available; MO: defense available; NH: TRP in effect; NY: TRP in effect; OK: defense available; PA: defense available; SC; TRP in effect; TX: defense available even though TRP in effect (Pennington v. State (54 S.W. 3d

19   852, 2001); WI: TRP in effect.
     [10]  California however, is not alone in experimenting with the use of cannabis as a medicine or palliative.  In fact, presently

20   16 states plus the District of Columbia, as noted above in fn. 9, have laws allowing for the medical use of cannabis: [Alaska (Ballot Measure 8)(1998); Arizona, (Proposition 203)(2010); California (Proposition 215)(1996); Colorado (Ballot

21   Amendment 20)(2000); District of Columbia (Amendment Act B18-622)(2010); Delaware (SB17, HB 17-4)(2011); Hawaii (SB 862, HB 13-12)(2000); Maine (Ballot Question 2)(1999); Michigan (Proposal 1)(2008); Montana (Initiative

22   148)(2004); Nevada (Ballot Question 9)(2000); New Jersey (SB 119, HB 25-13)(2010); New Mexico (SB 523, ,HB 32-3)(2007); Oregon (Ballot Measure 67)(1998); Rhode Island (SB 0710, HB 33-1)(2006); Vermont (SB 76, HB 645)(2004);

23   Washington (Initiative 692)(1998)].

24   In addition, 6 states have pending legislation to legalize medical cannabis: [Illinois (HB 0030); Massachusets (SB 1161, HB 625); New Hampshire (HB 442); New York (SB 2774); Ohio (HB 214); Pennsylvania (SB 1003).  Maryland has

25   separately passed a law favorable to medical cannabis although not directly legalizing it (SB 308).
     Source: http://medicalmarijuana.procon.org.

26   The total combined population of the above states is 160,000,000 citizens.  This represents 52% of the complete
     population of the United States as of 2010.

27   Source: http://en.wikipedia.org/wiki/List_of_U.S._states_and_territories_by_population.

28

                                          20

part of this nation's long history and tradition.  On the contrary, this long history shown here satisfies

a vital requirement for the recognition of a fundamental right and the Ninth Circuit invites this Court

to so recognize it:

> For now, federal law is blind to the wisdom of a future day when the right to use medical marijuana to alleviate excruciating pain may be deemed fundamental. Although that day has not yet dawned, considering that during the last ten years eleven states have legalized the use of medical marijuana, **that day may be upon us sooner than expected.**

Raich II, at 866 (Emphasis supplied).

The government also accuses Plaintiffs here of engaging in "a head count of states,"

appealing to the reasoning in Lawrence v. Texas, 539 U.S. 558 (2003). Def.Mem. 17, fn. 10.

But Plaintiffs have done no such thing. The fact that over 160,000,000 citizens of this nation

(and more to follow) have re-discovered the fundamental right to use cannabis to alleviate pain

and suffering and the long history of marijuana as medicine, is even more compelling that the

consensual right enumerated in Lawrence.  In Lawrence, the right was unrelated to the right to

alleviate pain and suffering - historically recognized in this country when it comes to the health

of its citizens - but merely a right of freedom of conduct that had nothing to do with human

suffering.  To that extent, Plaintiffs' argument is more compelling.   And, in the same way that

the government claims that "Congress" has already "rejected" Plaintiffs' arguments (Id), this

Court must note that the Constitution exists to protect citizens against the government, not the

other way around as the government suggests.

Therefore, the allegations in Plaintiffs' complaint, as to their fundamental right to use cannabis

for medical purposes "state[s] a plausible claim for, and survive[s] any motion to dismiss.  Ashcroft v.

Iqbal, 556 U.S. 662, 129 S. Ct.1937, 1950 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 555(2007)).

## V.   THE TENTH AMENDMENT ISSUE IS DISTINCT FROM THE COMMERCE CLAUSE DECISION IN GONZALES V. RAICH

The government attempts to merge the Commerce Clause decision in Gonzales v. Raich, 545

U.S. 1, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005) with Raich II, cited herein, alleging that because the

CSA is a valid exercise of Congress's commerce power, Plaintiffs' Tenth Amendment claim

21

1   necessarily fails" Def.Mem. 14:13-15. This is not accurate.

2          In <u>Raich II</u>, the court merely observed that "after <u>Gonzales v. Raich</u>, [in deciding the

3   Commerce Clause issue] it **would seem** that there can be no *Tenth Amendment* violation in this case"

4   and, because Raich, herself, conceded the issue, she would not prevail on her motion for a preliminary

5   injunction <u>Raich II,</u> at 867-868.  The <u>Raich II</u> court never decided that ultimate issue, its language is

6   *dicta,* as indicated previously, and it remains an issue to be determined here.

7          In fact, there are a multitude of Supreme Court cases that identify the Tenth Amendment in a

8   more profound way.  See, <u>New York v. United States</u>, 505 U.S. 144,157 (1977) ("the power of the

9   Federal Government is subject to limits that may, in a given instance, reserve power to the States");

10  <u>United States v. Lopez</u>, 514 U.S. 549, 566 (1995) (Congress lacks power over the power of the States

11  to be primarily responsible for the health and safety of their citizens); and <u>United States v. Oakland</u>

12  <u>Cannabis Buyers' Co-op</u>, 532 U.S. 483, 501 (2001) (The duty of the federal courts is to "avoid or

13  minimize the conflict between federal and state law, particularly in situations in which the citizens of a

14  State have chosen to serve as a laboratory in the trial of novel social and economic experiments

15  without risk to the rest of the country") Stevens, J., concurring).

16         Therefore, in regards to the medical use of cannabis as being related to the health and safety of

17  the citizens of the various states, Plaintiffs have stated facts sufficient to make a plausible claim that

18  there is a recognizable Tenth Amendment violation in this case

19  **VI.    THE GOVERNMENT'S CLASSIFICATION OF CANNABIS AS HAVING NO**
20  **MEDICAL VALUE PURSUANT TO THE CSA'S SCHEDULING SCHEME, IS**
    **NOT RATIONALLY BASED AND THUS, IMPERMISSIBLY**
21  **DISCRIMINATES AGAINST MEDICAL CANNABIS PATIENTS THROUGH**
    **ITS ABSOLUTE PROHIBITION AGAINST MEDICAL USE[11]**

22         In 2012, there is overwhelming scientific and medical evidence that marijuana has great

23  medical value that has been publicly accepted by those learned communities.  Study after study has

24  proven the value.  Prominent respectable associations have understood the medical and scientific

25  reality.  Patients with access to marijuana as medicine find relief.  Patients denied access suffer cruelly

26  _____

27  [11] The government's briefing regarding equal protection focuses primarily on one component identified in the amended
    complaint, relating to selective prosecution.  Equal protection is a broader concept as indicated in ¶42 of the complaint.

28

22

1   and unnecessarily.  There is no rational basis for a more than 40 year old conclusion that marijuana

2   has no accepted medical use.

3       The Court can consider the following facts:

4       1.  Two governors recently submitted a petition to the government to re-classify cannabis from

5           Schedule 1 to Schedule 2 (Chaffee from Rhode Island and Gregoire from Washington

6           State.)  Governor Shumlin from Vermont recently indicated that he would join that

7           petition.  RJN, Exh. 9.

8       2.  Hundreds of studies show that cannabis has medical efficacy.  See, Declaration of Paul

9           Armentano, RJN Exh. 11.  In that declaration, Mr. Armentano cites numerous studies.

10      3.  Plaintiffs in this case, including the individual plaintiff patient, BILLIE JO MAISONET,

11          use cannabis with a doctor's recommendation (Complaint, ¶9).

12      4.  The federal government generally blocks research into the medical benefits and

13          applications of medical cannabis, thereby preventing patients from accessing this drug.

14          This is well-documented by Dr. Rick Doblin.  See, RJN, Exh. 8. The court case described

15          by Dr. Doblin involves the federal government's efforts to block research initiatives.  For

16          example, footnote 6 of plaintiffs' amended complaint notes that representatives of the

17          National Institute for Drug Abuse rarely allow research into cannabis applications and

18          when they do, the few approved research projects are designed to highlight the negative

19          components of the drug.

20      5.  The California Medical Association, the nation's largest state-organization of medical

21          professionals, recently announced its policy position that medical cannabis should be re-

22          scheduled to Schedule II to recognize its medical qualities ("Cannabis and the Regulatory

23          Void", October, 2011.)  This Court is asked to take judicial notice of that pronouncement

24          (RJN, Exh. 14).  Other medical associations have made similar public statements.

25      6.  The Veterans Administration, another branch of defendant's federal system, announced

26          over a year ago, in July, 2010, that veterans treated at VA centers around the country with

27

28

23

1    opiods would be allowed to continue that treatment even if also using cannabis.  RJN

2    Exh. 10.

7.    The US government holds US Patent 6630507, obtained in October, 2003, titled

4    "**Cannabinoids as antioxidants and neuroprotectants**" The patent claims that

5    "Cannabinoids have been found to have antioxidant properties, unrelated to NMDA

6    receptor antagonism. This new found property makes cannabinoids useful in the treatment

7    and prophylaxis of wide variety of oxidation associated diseases, such as ischemic, age-

8    related, inflammatory and autoimmune diseases. The cannabinoids are found to have

9    particular application as neuroprotectants, for example in limiting neurological damage

10    following ischemic insults, such as stroke and trauma, or in the treatment of

11    neurodegenerative diseases, such as Alzheimer's disease, Parkinson's disease and HIV

12    dementia."  RJN, Exh. 15.

8.    The Federal Government's website for the National Institute for Drug Abuse includes the

14    following excerpt : " Is Marijuana Medicine?  The potential medicinal properties of

15    marijuana have been the subject of substantive research and heated debate. Scientists have

16    confirmed that the cannabis plant contains active ingredients with therapeutic potential for

17    relieving pain, controlling nausea, stimulating appetite, and decreasing ocular pressure.

18    Cannabinoid-based medications include synthetic compounds, such as dronabinol

19    (Marinol®) and nabilone (Cesamet®), which are FDA approved, and a new, chemically

20    pure mixture of plant-derived THC and cannabidiol called Sativex®, formulated as a

21    mouth spray and approved in Canada and parts of Europe for the relief of cancer-associated

22    pain and spasticity and neuropathic pain in multiple sclerosis.  Scientists continue to

23    investigate the medicinal properties of THC and other cannabinoids to better evaluate and

24    harness their ability to help patients suffering from a broad range of conditions, while

25    avoiding the adverse effects of smoked marijuana. RJN, Exh. 16.

26    In short, scientists nationally and internationally, including VA doctors and the government's

27    own agency which is responsible for studying drug abuse, recognize the medical value of cannabis.

28

24

1   medical cannabis providers, caregivers and patients, nevertheless, find themselves in danger of

2   prosecution or forfeiture of property from their use of what has been proven to be a valuable medicine.

3   This is invidious discrimination against a medicine that provides so much benefit and against human

4   beings whose suffering is alleviated by using marijuana, in compliance with state law.

5         When Congress passed the Controlled Substances Act in 1970, included in it was a

6   "scheduling" design that placed cannabis in Schedule 1 as having no medical value.  Clearly, the

7   respected research has recognized the fallacy of that 40 year old Congressional finding.  The current

8   medical uses by many patients in numerous states (16 plus the District of Columbia) belie the

9   placement of cannabis on Schedule I.  Accordingly, there is no rational basis to classify cannabis as

10  having no medical value.   Additionally, it makes no sense to treat patients using cannabis differently

11  in one state from medical cannabis patients in another state.   But ultimately, the CSA's prohibition

12  against medical use in compliance with State law is invidious discrimination as applied to patients

13  generally who use cannabis to resolve illnesses and health problems versus patients who use other

14  drugs to do the same thing.

15                              **<u>CONCLUSION</u>**

16        For the foregoing reasons, this court should deny the motion to dismiss.  All the claims state

17  viable causes of action.

18  Date: January 6, 2012                    *s/Matthew Kumin*

19                                           Matthew Kumin, Attorney for Plaintiffs
                                             KUMIN SOMMERS LLP
20                                           870 Market Street, Suite 428
                                             San Francisco, CA 94102
21                                           Telephone:   (415) 434-4500
                                             Facsimile:   (415) 434-8453
22                                           e-mail:       matt@kuminsommers.com

23

24

25

26

27

28

Additional Counsel for Plaintiffs

ERIC D. SHEVIN, State Bar No. 160103
LAW OFFICE OF ERIC D. SHEVIN
15260 Ventura Blvd., Ste. 1050
Sherman Oaks, CA 91403
Telephone:     (818) 784-2700
Facsimile:     (818) 784-2411
e-mail:          eshevin@aol.com

ARTHUR D. HODGE, State Bar No. 162563
5062 Lankershim Blvd., Ste. 2060
North Hollywood, CA 91601
Telephone:     (818) 854-4874
Facsimile:     (818) 827-4901
e-mail:          ADHLAW@GMAIL.COM

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

I hereby certify that, on 6 January 2012, I caused to be electronically filed the foregoing with the clerk of the court by using the CM/ECF system for filing and transmittal of Notice of Electronic Filing to the CM /ECF registrants on record in this matter.

*s/Matthew Kumin*
Matthew Kumin

PLS' MPA IN OPPOSITION TO DEFS' MOTION TO DISMISS – Case No.CV11-9200 DMG (PJWx)